# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| KATHLEEN HART COLEMAN, | : | Case No. 3:16-cv-341 |
| | : | |
| Plaintiff, | : | |
| | : | |
| | : | Magistrate Judge Sharon L. Ovington |
| vs. | : | (by full consent of the parties) |
| | : | |
| NANCY A. BERRYHILL, | : | |
| COMMISSIONER OF THE SOCIAL | : | |
| SECURITY ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |

---

## DECISION AND ENTRY

---

## I.     Introduction

Plaintiff Kathleen Hart Coleman brings this case challenging the Social Security Administration's denial of her application for period of disability and Disability Insurance Benefits. She applied for benefits on July 24, 2013, asserting that she could no longer work a substantial paid job. Administrative Law Judge (ALJ) Gregory G. Kenyon concluded that she was not eligible for benefits because she is not under a "disability" as defined in the Social Security Act.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #11), Plaintiff's Reply (Doc. #12), and the administrative record (Doc. #6).

Plaintiff seeks a remand of this case for payment of benefits or, at a minimum, for further proceedings. The Commissioner asks the Court to affirm ALJ Kenyon's non-disability decision.

## II. <u>Background</u>

Plaintiff asserts that she has been under a "disability" since December 1, 2009. She was forty years old at that time and was therefore considered a "younger person" under Social Security Regulations. *See* 20 C.F.R. § 404.1563(c). She has a limited education. *See id.* § 404.1564(b)(3).

### A. Plaintiff's Testimony

Plaintiff testified at the hearing before ALJ Kenyon that she was diagnosed with rheumatoid arthritis when she was thirty years old. (Doc. #6, *PageID* #90). She experiences joint pain. *Id.* at 71-72. It started in her right knee and then progressed to both knees, her hands, her middle toe on one foot, and her hips. *Id.* at 72. In her hands, the pain can vary. *Id.* They ache and pulsate—"like when you're sick and you have body aches from the flu." *Id.* at 73. On a scale from one to ten, her daily pain is about five or six but if she has a bad flare, it is about eight or nine. *Id.* Her grip is not very good and she drops things. *Id.* at 72. She has difficulty cooking, cannot reach into the washer or dryer to grab clothing, struggles to squeeze shampoo or conditioner out in the shower, and cannot wear clothing with buttons or zippers. *Id.* at 74. She can only write or use, for example, silverware, for a short period of time. *Id.* at 75.

Plaintiff also has pain and swelling in her knees. *Id.* at 75-76. When she goes from sitting to standing, "it just feels like they're just going to go in half." *Id.* at 76. She

ices her knees every other day or every couple days for up to an hour and then switches to heat. *Id.* at 77. It helps but the pain never goes away completely. *Id.* Plaintiff's legs cannot stay still for a long period of time. *Id.* She has to move them every "little bit." *Id.* Plaintiff has a lift chair in her living room because otherwise she needs someone to help her stand up. *Id.* at 78-79. She also has safety devices in the bathroom such as bars on the wall. *Id.* at 79. She has fluid in both knees. *Id.* at 96. An orthopedic surgeon told her that there was no point in draining them because the fluid would return. *Id.*

She treated with Dr. Hawkins, a rheumatologist, for seven to ten years. *Id.* at 91-92. He prescribed several different kinds of medication. *Id.* at 92. Plaintiff told him that one of them, methotrexate, made her sick, but he kept pushing it on her. *Id.* He also continually increased the dose of medicines that did not work. *Id.* He tried giving her shots of methotrexate; it gave her "massive migraines." *Id.* at 93. Plaintiff's pain continued and she told her treating physician she could not continue to treat with Dr. Hawkins. *Id.* He referred her to Dr. [Alappatt], who was her treating rheumatologist at the time of the hearing. *Id.* at 91-93.

Dr. Alappatt recommended Plaintiff go through a genology group for testing. *Id.* at 93. The results revealed Plaintiff had rheumatoid arthritis, Sjogren's syndrome,[1] and lupus. *Id.* at 94. "Dr. Alapat, now that he knows this, …and he's got my history, …

---

[1] "Sjogren's (SHOW-grins) syndrome is a disorder of your immune system identified by its two most common symptoms — dry eyes and a dry mouth. The condition often accompanies other immune system disorders, such as rheumatoid arthritis and lupus. In Sjogren's syndrome, the mucous membranes and moisture-secreting glands of your eyes and mouth are usually affected first — resulting in decreased tears and saliva." *Sjogren's Syndrome,* MAYO CLINIC (Aug. 9, 2017) http://www.mayoclinic.org/diseases-conditions/sjogrens-syndrome/home/ovc-20345863.

we're working on a plan. And …we don't know how long it will take, we don't know how many different medicines because I have to find something that treats everything. I can't just treat one." *Id.*

Plaintiff's symptoms from Sjogren's syndrome include dry mouth, dry eyes, and dry skin. *Id.* at 79-80.

She also struggles with depression. *Id.* at 80. She was diagnosed when she was twenty-one years old. *Id.* She has crying spells "out of the blue …" a couple times per month. *Id.* at 80-81. It usually depends on what medication she is taking at a time. *Id.* at 81. "But the only problem with the medication, with any type of depression medicine, is your body gets used to it." *Id.* She has trouble concentrating but she is not sure if it is because of depression, anxiety, medicine, or a chronic illness such as lupus. *Id.* Her daughter and son-in-law have to help her remember dates. *Id.* at 82. A combination of pain and depression causes her to be short with people sometimes. *Id.*

Plaintiff lives in a house with her husband and five-year-old son. *Id.* at 69-70. Plaintiff takes care of her child with a lot of help from her family. *Id.* at 86. She has a driver's license and can drive short distances. *Id.* at 70. If she drives for too long, her knees "lock up." *Id.* at 95. When Plaintiff writes, "it's very legible." *Id.* at 70. But if she writes for too long, the swelling and pain in her hands causes her writing to become less legible. *Id.* at 71. She is able to read a newspaper article. *Id.*

Plaintiff testified that she can only lift small things like food out of the refrigerator or plates. *Id.* at 84. She can only stand for fifteen to twenty minutes at a time. *Id.* She can only walk short distances—room to room or in small stores such as Walgreens or

CVS.  *Id.* at 85.  She can sit for thirty minutes to one hour.  *Id.*  If she sits for longer than that, her knees lock up and she has to shift positions.  *Id.*  She cannot walk up and down stairs.  *Id.*  When there is really cold weather, her joints get stiff and it is hard for her to move.  *Id.* at 83.  She also has difficulty if it is really hot outside.  *Id.*

Plaintiff can take care of her personal needs on some days.  *Id.* at 86.  She can slip on a shirt and pants.  *Id.*  But on days she is having a flare up and the swelling is excruciating, then her daughter or husband has to help her.  *Id.*  Plaintiff has "quite a few" flare ups every month—"at least two weeks out of a month."  *Id.* at 88.  On days she is having a flare up, her daughter or son-in-law takes her son to school.  *Id.*  Plaintiff listens to Joyce Meyer and lies down for between an hour and three hours.  *Id.* at 89.  Then, if she is able to, she picks her son up from school, and they have family time.  *Id.*  When her husband gets home, they have dinner, her husband helps her put things away, and everyone goes to sleep.  *Id.*

When she is not having a flare up, she takes her son to school.  *Id.* at 88.  When she comes home, she tries to pick up if she can or at least do something around the house.  *Id.* at 90.  She then takes a nap and picks her son up from school.  *Id.*  She tries to play with her son outside on days that she feels better.  *Id.*

### B.    Medical Opinions

#### i.    Kurt A. Fleagle, M.D.

Dr. Fleagle, Plaintiff's treating physician, completed a physical residual functional capacity questionnaire on April 30, 2015.  *Id.* at 638-42.  He diagnosed Plaintiff with lupus and rheumatoid arthritis and indicated that she also suffers from depression.  *Id.* at

5

638-39. He opined her prognosis is fair. *Id.* at 638. Plaintiff's symptoms include joint pain and swelling in her left knee, both hips, and both hands. *Id.* She has severe pain daily that is worse with activity and limits her activities of daily living. *Id.* Her treatment includes narcotics which can make her feel fatigued. *Id.* Dr. Fleagle indicated Plaintiff's pain is so severe that it interferes with her attention and concentration constantly. *Id.* at 639. She is incapable of even low stress jobs because her pain diverts her focus. *Id.*

Dr. Fleagle opined Plaintiff can walk without rest or severe pain for less than one block. *Id.* She can sit for thirty minutes at one time for a total of less than two hours in an eight-hour workday and stand for twenty minutes at one time for a total of less than two hours. *Id.* at 639-40. In an eight-hour workday, Plaintiff must walk every thirty minutes for ten minutes at a time. *Id.* at 640. She needs a job that allows her to shift positions at will and take unscheduled breaks. *Id.* She will need to take a break every hour to rest for ten minutes. *Id.* She can occasionally lift and carry less than ten pounds and never lift and carry more than ten or more pounds. *Id.* She can frequently look down, look up, turn her head left or right, or hold her head in a static position. *Id.* at 641. She can never crouch/squat, rarely stoop or climb ladders, and occasionally twist or climb stairs. *Id.* She has significant limitations with reaching, handling, or fingering. *Id.* During an eight-hour day, she can use her right or left hand to grasp, turn, or twist objects fifty percent of the time; use her right or left fingers for fine manipulations forty percent of the time; and use her right or left arms for reaching forty percent of the time. *Id.* As a result of her impairments or treatment, Plaintiff would likely be absent from work more than four days per month. *Id.*

### ii.     Damian M. Danopulos, M.D.

On September 5, 2013, Dr. Danopulos examined Plaintiff.  *Id.* at 436-46.  His "objective findings were 1) history of rheumatoid arthritis, which has been treated on and off with current complaints of bilateral knee and bilateral hand pain, but without deformities, 2) well controlled hypertension, 3) history of migraine headaches without any injury, 4) exogenous versus morbid obesity and 5) history of depression, which is going to be evaluated by a Social Security psychologist [in] September 2013."  *Id.* at 442. He noted that Plaintiff moved around his office and did all the examinations properly.  *Id.* "Her main problem seems to be her rheumatoid arthritis, which does not effect any joints with only pain in both knees and in both hands."  *Id.*  He opined that her hypertension, headaches, and obesity do not affect any work-related activities.  *Id.*  Dr. Danopulos concluded, "She can do semi-sedentary or sedentary work and she cannot lift more than 10 pounds at a time and she has to be followed by her rheumatologist and not discontinue her medications as she did."  *Id.*

### iii.     Anton Freihofner, M.D., & Michael Delphia, M.D.

Dr. Freihofner reviewed Plaintiff's records on September 12, 2013.  *Id.* at 113-27. He opined Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently.  *Id.* at 121.  She can stand and/or walk for six hours in an eight-hour day and sit for six hours.  *Id.*  She can occasionally crouch and crawl and never climb ladders, ropes, and scaffolds.  *Id.*  He concluded Plaintiff is not disabled.  *Id.* at 126.

On October 25, 2013, Dr. Delphia reviewed Plaintiff's records and confirmed Dr. Freihofner's assessment.  *Id.* at 129-42.

**III.  Standard of Review**

The Social Security Administration provides Disability Insurance Benefits to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 423(a)(1). The term "disability"—as defined by the Social Security Act—has specialized meaning of limited scope. It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job—i.e., "substantial gainful activity," in Social Security lexicon. 42 U.S.C. § 423(d)(1)(A); *see Bowen,* 476 U.S. at 469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a

scintilla of evidence but less than a preponderance ….” *Rogers*, 486 F.3d at 241

(citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal

criteria—may result in reversal even when the record contains substantial evidence

supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647,

651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial

evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to

follow its own regulations and where that error prejudices a claimant on the merits or

deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part

*Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47

(6th Cir. 2004)).

## IV.    The ALJ's Decision

As noted previously, it fell to ALJ Kenyon to evaluate the evidence connected to

Plaintiff's application for benefits. He did so by considering each of the five sequential

steps set forth in the Social Security Regulations. *See* 20 C.F.R. § 404.1520. He reached

the following main conclusions:

Step 1:     Plaintiff has not engaged in substantial gainful employment since
            December 1, 2009.

Step 2:     She has the severe impairments of degenerative joint disease (DJD) of
            the knees; a history of rheumatoid arthritis (RA); Sjogen's syndrome;
            depression; and an anxiety disorder.

Step 3:     She does not have an impairment or combination of impairments that
            meets or equals the severity of one in the Commissioner's Listing of
            Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

Step 4:         Her residual functional capacity, or the most she could do despite her impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consists of "light work … subject to the following limitations:  (1) occasional crouching, crawling, kneeling, stooping, and climbing of ramps and stairs; (2) no climbing of ladders, ropes, and scaffolds; (3) no work around hazards such as unprotected heights or dangerous machinery; (4) occasional operation of foot controls; (5) frequent use of the hands for handling and fingering; (6) no concentrated exposure to wet or cold environments; (7) limited to performing unskilled, simple, repetitive tasks; (7) occasional contact with co-workers, supervisors, and the public; (8) no jobs involving sales transactions or negotiations; (9) no fast paced production work or jobs involving strict production quotas; and (10) limited to performing jobs in a relatively static work environment in which there is very little, if any, change in the job duties or the work routine from one day to the next. ."

Step 4:         She is unable to perform any of her past relevant work.

Step 5:         She could perform a significant number of jobs that exist in the national economy.

(Doc. #6, *PageID* #s 46-57).  These main findings led the ALJ to ultimately conclude that Plaintiff was not under a benefits-qualifying disability.  *Id.* at 57.

## V.    <u>Discussion</u>

Plaintiff contends that the ALJ erred at step two in determining that lupus was not a severe impairment.  Additionally, she asserts that the ALJ failed to properly apply the treating physician rule.  She further argues the ALJ erred in failing to fully account for all of her impairments in the residual functional capacity assessment and in the hypothetical posed to the vocational expert.  The Commissioner maintains that substantial evidence supports both the ALJ's findings at step two and the ALJ's assignment of little weight to Plaintiff's treating physician's opinion.  Further, the Commissioner asserts that the ALJ reasonably relied on the vocational expert's testimony to find Plaintiff was not disabled.

### A.    Step Two

At step two, the ALJ considers the "medical severity of [the claimant's] impairments." 20 C.F.R. § 404.1520(a)(4). "An impairment or combination of impairments is not severe if it does not significantly limit [the applicant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). The Sixth Circuit has construed step two as a "*de minimis* hurdle." *Higgs v. Bowen,* 880 F.2d 860, 862 (6th Cir. 1988) (citations omitted). Under this view, "an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Id.* (citation omitted).

Plaintiff contends that the ALJ erred at step two in determining that lupus is not a severe impairment. ALJ Kenyon acknowledged that Plaintiff was diagnosed with lupus erythematosus in March 2015. (Doc. #6, *PageID* #49). He found, "That diagnosis has not been substantiated by further evaluation, but, in any case, it has not been established as existing for 12 consecutive months. Therefore, it is not found to be a severe impairment …." *Id.*

Plaintiff correctly points out that the Regulations do not require the impairment to have existed for 12 consecutive months. Instead, "Unless [the claimant's] impairment is expected to result in death, it must have lasted or *must be expected to last* for a continuous period of at least 12 months." 20 C.F.R. § 404.1509 (emphasis added). There is no cure for lupus. *See Lupus,* MEDLINEPLUS, https://medlineplus.gov/lupus.html (last updated Aug. 28, 2017). Without a cure, the ALJ unreasonably assumed that Plaintiff's recently diagnosed lupus would somehow end before meeting the 12-consecutive-month

requirement. Indeed, without a cure, there is only one reasonable conclusion: it is expected that Plaintiff's lupus will last for a continuous period of at least 12 months.

This, however, does not establish that Plaintiff's condition was severe. "The mere diagnosis of [an impairment] … says nothing about the severity of the condition." *Higgs,* 880 F.2d at 863 (citing *cf. Foster v. Bowen,* 853 F.2d 483, 489 (6th Cir. 1988)). Plaintiff's treating physicians did not indicate Plaintiff's ability to perform basic work activities was limited by her conditions. Dr. Alappatt's treatment notes indicate, "The AVISE test also showed moderately positive for LUPUS. … We think Kathleen has Sjogrens with Lupus." (Doc. #6, *PageID* #631). Dr. Fleagle also indicated Plaintiff has lupus, but he does not attribute any specific symptoms to it. *Id.* at 638.

Further, an ALJ generally does not commit reversible error by finding a non-severe impairment as long as: (1) the ALJ also found that the claimant has at least one severe impairment; and (2) the ALJ considered both the severe and non-severe impairments at the remaining steps in the sequential evaluation. *See Maziarz v. Sec'y of Health and Human Servs.,* 837 F.2d 240, 244 (6th Cir. 1987); *see also Fisk v. Astrue,* 253 F. App'x 580, 583 (6th Cir. 2007); *Nejat v. Comm'r of Soc. Sec.,* 359 F. App'x 574, 577 (6th Cir. 2009); *Pompa v. Comm'r of Soc. Sec.,* 73 F. App'x 801, 803 (6th Cir. 2003) ("[O]nce the ALJ determines that a claimant has at least one severe impairment, the ALJ must consider all impairments, severe and non-severe, in the remaining steps.").

At the remaining steps, ALJ Kenyon considered limitations Plaintiff attributed to lupus. He acknowledged that Plaintiff testified that she has trouble with concentration and is unsure if it was because of her mental impairments or because of lupus. Although

he does not attribute it to lupus, he accommodated this deficit: "Her diminished stress tolerance and diminished concentration also require that she be restricted from fast-paced production work or jobs involving strict production quotas and limited to performing jobs in a relatively static work environment in which there is very little, if any, change in the job duties or the work routine from one day to the next." (Doc. #6, *PageID* #54). He also addressed Dr. Fleagle's view of Plaintiff's limitations. However, as addressed below, he improperly assigned "little weight" to Dr. Fleagle's opinions without providing "good reasons" supported by substantial evidence. *Id.* at 55.

## B. Medical Opinions

Social Security Regulations require ALJs to adhere to certain standards when weighing medical opinions. "Key among these is that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule." *Rogers,* 486 F.3d at 242 (citations omitted). The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20 C.F.R. § 404.1527(c)(2)); *see Gentry*, 741 F.3d at 723.

If the treating physician's opinion is not controlling, "the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and

consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).

The Regulations also require ALJs to provide "good reasons" for the weight placed upon a treating source's opinions. *Wilson*, 378 F.3d at 544. This mandatory "good reasons" requirement is satisfied when the ALJ provides "specific reasons for the weight placed on a treating source's medical opinions." *Id.* (quoting Soc. Sec. R. 96-2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). The goal is to make clear to any subsequent reviewer the weight given and the reasons for that weight. *Id.* Substantial evidence must support the reasons provided by the ALJ. *Id.*

ALJ Kenyon assigned "little weight" to Dr. Fleagle's assessment that Plaintiff is "entirely disabled from employment." (Doc. #6, *PageID* #55). Other than generically stating that he "considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p[,]" ALJ Kenyon does not refer to the treating physician rule or either of its conditions. *Id.* at 52. This constiututes error: "The failure to provide 'good reasons' for not giving [the treating physician's] opinions controlling weight hinders a meaningful review of whether the ALJ properly applied the treating-physician rule that is at the heart of this regulation." *Gayheart,* 710 F.3d at 376 (citing *Wilson,* 378 F.3d at 544).

Indeed, the ALJ does not acknowledge that Dr. Fleagle is Plaintiff's "treating physician." He instead refers to Dr. Fleagle as her "primary care physician" and, rather than giving Dr. Fleagle deference as such, the ALJ emphasizes that Dr. Fleagle is "not a specialist who has treated the claimant for her rheumatological complaints." (Doc. #6.

*PageID* #55).  Although specialization is a factor for an ALJ to consider, "these factors are properly applied only after the ALJ has determined that a treating-source opinion will not be given controlling weight." *Gayheart,* 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2).

ALJ Kenyon only provides one other reason for discounting Dr. Fleagle's opinion: He found that the "assessment is grossly disproportionate to the modest level of treatment the claimant has received for her rheumatoid arthritis as well as the minimal level of change shown on the MRI's and x-rays of the claimant's right knee." (Doc. #6, *PageID* #55).  It is not clear what the ALJ means by "modest" as this is not a term defined by the Regulations or Social Security Administration.  But, under the ordinary definition of the word, a reasonable person would not find that Plaintiff's treatment has been "modest."

The record shows that Plaintiff regularly sees Dr. Fleagle.  Specifically, she saw him three times in 2009, two times in 2010, three times in 2011, three times in 2012, one time in 2013, three times in 2014, and at least one time in 2015.  *Id.* at 359-433, 605-30.

Additionally, she has seen several specialists.  Plaintiff has treated with at least two rheumatologists, Dr. Hawkins and Dr. Alapatt.  She saw Dr. Hawkins three times in 2011 and three times in 2012.  *Id.* at 309-34.  Dr. Hawkins provided her with a greater than modest level of care.  He prescribed several different medications—all without significant effect.  For example, in February 2011, Dr. Hawkins indicated Plaintiff should take Celebrex 200 mg daily and sulfasalazine 500 mg twice per day.  *Id.* at 311-12.  In May 2011, he increased sulfasalazine to one gram.  *Id.* at 316.  In August 2011, Dr. Hawkins injected Plaintiff's right knee with a lidocaine local anesthetic and 40 mg

Kenalog. *Id.* at 320. He also prescribed 7.5 mg methotrexate and instructed Plaintiff to take folic acid one mg daily. *Id.* He doubled Plaintiff's methotrexate (15 mg) in early January 2012. *Id.* at 325. In May 2012, Dr. Hawkins noted that Plaintiff did not notice improvement with the increase in methotrexate. *Id.* at 328. Nonetheless, he increased it to 22.5 mg daily. *Id.* at 329. In July 2012, Plaintiff reported to Dr. Hawkins that she stopped taking Celebrex because she was experiencing shortness of breath. *Id.* at 332. Additionally, Dr. Hawkins noted that she "has not noticed significant improvement …." *Id.* He nevertheless continued methotrexate and folic acid. *Id.* at 333. He also added naproxen 275 mg twice per day (in place of Celebrex) and Plaquenil 200 mg twice per day. *Id.*

These records are consistent with Plaintiff's testimony:

> Dr. Hawkins was recommended to me … as a very good rheumatologist to go to -- and in the beginning … everything was fine. We were trying medicines, … but as time went on what was starting to get frustrating was I kept trying to explain the methotrexate was making me sick. And he kept really trying to push certain medicines that he kept wanting me to try or, "Oh, it's not working, we're just going to increase it. Well that didn't do anything and then there was times I was so frustrated I went off. I didn't go, I didn't take any medicine. There was no difference in being on the medicine and being off the medicine, so I obviously thought what he was giving me wasn't working. And then I would break down and I couldn't take the pain then I would go back and then we would talk about medicine again and then the last thing where I couldn't -- they wanted to try methotrexate shots and we tried that. Well it gave me massive migraines. … So that's when I went to Dr. [Fleagle] and I just, I told him, "I just -- I can't, I can't do this." I said, "I don't know what to do now." And I actually wanted him to be my rheumatologist, but he couldn't do that. So he referred Dr. [Alappatt] to me and that's who I've been seeing since.

*Id.* at 92-93.

Specifically, Dr. Fleagle referred Plaintiff to Dr. Alappatt, a rheumatologist, in February 2015. *Id.* at 626. Dr. Alappatt sent her for tests that revealed she has rheumatoid arthritis, Sjogrens, and lupus. *Id.* at 631.

In addition to seeing rheumatologists, in May 2012, Plaintiff also saw Dr. Stephen A. Weeber, a podiatrist, for left heel pain. *Id.* at 384. He assessed that Plaintiff "was suffering from plantar fasciitis as a result of her abnormally pronated gait exacerbated by her equinus contracture and her limb length discrepancy." *Id.* He indicated her treatment plan included resting, icing, the use of a heel lift, and stretching on a slant board. *Id.*

Plaintiff also saw Dr. Donald W. Ames, an orthopedist, in September 2012 for her right knee pain. *Id.* at 471. He indicated that an x-ray revealed moderately large effusion. *Id.* He injected 1 cc of Kenalog and 1 cc of Marcaine into her knee. *Id.* at 472. She returned to Dr. Ames office in November 2012 and reported the injection helped for three days. *Id.* at 467. Dr. Ames recommended therapy for quad strengthening. *Id.* at 469. Plaintiff saw Dr. Ames in July 2014 for pain in both her knees. *Id.* at 463. He noted, "This patient has patellofemoral symptoms of both knees which I think will benefit from physical therapy. No surgery is contemplated. She has not benefited from injections in the past. Oral medications have not been benefiting her rheumatoid disease." *Id.* at 466.

Together, this evidence illustrates Plaintiff's extensive—not modest—treatment history. Accordingly, substantial evidence does not support the ALJ's conclusion that Dr. Fleagle's opinion is "grossly disproportionate" to Plaintiff's "modest treatment."

The ALJ also found Dr. Fleagle's opinion "grossly disproportionate" to "the minimal level of change shown on the MRI's and x-rays of the claimant's right knee." *Id.* at 55. It is not clear how the amount of change in Plaintiff's right knee is relevant to Dr. Fleagle's opinion, as he does not discuss Plaintiff's right knee in his opinion. Nonetheless, there were changes to Plaintiff's right knee between 2008 and 2014. On January 26, 2008, an MRI revealed "[s]mall to moderate joint effusion. …" *Id.* at 407-08. Plaintiff had another MRI on December 15, 2010. *Id.* at 405-06. It showed "Grade 2 chondromalacia patella"[2] and "[d]iffuse tendinosis of the patellar tendon likely chronic in nature."[3] *Id.* at 406. On September 19, 2012, an x-ray revealed "Mild medial joint space narrowing. Moderately large effusion. …" *Id.* at 472. Shortly thereafter, on October 10, 2012, an MRI showed "1. Small joint effusion. 2. Low-grade chondromalacia lateral patellar facet. …" *Id.* at 564. Last, an MRI on June 28, 2014 revealed "1. Small joint effusion and mild synovitis. 2. Low-grade chondromalacia patella. 3. Low-grade chondromalacia medial compartment. …" *Id.* at 586. There is a significant change between *only* "[s]mall to moderate joint effusion" in 2008 to "[s]mall joint effusion and mild synovitis[;] [l]ow-grade chondromalacia patella[;] [and] [l]ow-grade

---

[2] Chondromalacia occurs when "the cartilage inside a joint softens and breaks down. … The cartilage loses its ability to protect the ends of the bones as the joint moves. The ends of the bones can rub together, causing pain." *Chondromalacia,* HARVARD MEDICAL SCHOOL (Jan. 2013) https://www.health.harvard.edu/pain/chondromalacia.

[3] "Tendinosis is a degeneration of the tendon's collagen in response to chronic overuse; when overuse is continued without giving the tendon time to heal and rest, such as with repetitive strain injury, tendinosis results. Even tiny movements, such as clicking a mouse, can cause tendinosis, when done repeatedly." Evelyn Bass, *Tendinopathy: Why the Difference Between Tendinitis and Tendinosis Matters*, INT'L J. THERAPEUTIC MASSAGE & BODYWORK (Mar. 31, 2012) https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3312643/.

chondromalacia medial compartment" in 2014. Substantial evidence thus does not support ALJ Kenyon's conclusion that Dr. Fleagle's opinion is "grossly disproportionate" to "the minimal level of change shown on the MRI's and x-rays of the claimant's right knee."

In addition to these errors, ALJ Kenyon failed to address several relevant factors needed in this case. For example, he did not discuss the length of Dr. Fleagle's treatment relationship with Plaintiff or the frequency of exam. *See* 20 C.F.R. § 404.1527(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."). He similarly did not address the consistency of Dr. Fleagle's opinion with the record as a whole. *See id.* § 404.1527(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion."). "Because the reason-giving requirement exists to 'ensur[e] that each denied claimant receives fair process,' we have held that an ALJ's 'failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight' given '*denotes a lack of substantial evidence,* even where the conclusion of the ALJ may be justified based upon the record.'" *Blakley*, 581 F.3d at 407 (quoting *Rogers,* 486 F.3d at 243).

Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.[4]

_____

[4] In light of the above discussion, and the resulting need to remand this case, an in-depth analysis of Plaintiff's other challenges to the ALJ's decision is unwarranted.

## C.     Remand

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746. Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff lacks credibility, *see Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and the evidence of disability is not strong while contrary evidence is lacking. However, Plaintiff is entitled to an Order remanding

this case to the Social Security Administration pursuant to sentence four of § 405(g) due to the problems discussed above. On remand, the ALJ should be directed to evaluate the evidence of record, including the medical source opinions, under the applicable legal criteria mandated by the Commissioner's Regulations and Rulings and by case law; and to evaluate Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability and whether her application for Disability Insurance Benefits should be granted.

### IT IS THEREFORE ORDERED THAT:

1. The Commissioner's non-disability finding is vacated;

2. No finding is made as to whether Plaintiff Kathleen Hart Coleman was under a "disability" within the meaning of the Social Security Act;

3. This matter is **REMANDED** to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Decision and Entry; and

4. The case is terminated on the Court's docket.

Date: September 13, 2017             *s/Sharon L. Ovington*
                                           Sharon L. Ovington
                                           United States Magistrate Judge